887 F.2d 1388
 Carl Edwin CASE, Petitioner-Appellee, Cross-Appellant,
v.
Eloy MONDRAGON, Warden, Southern New Mexico Correctional
Facility, Respondent-Appellant, Cross-Appellee,
and
Attorney General of the State of New Mexico, Respondent.
 Nos. 88-1685, 88-1748.
 United States Court of Appeals,
Tenth Circuit.
 Oct. 25, 1989.
 
 Peter Schoenburg, Asst. Federal Defender, Albuquerque, N.M., for petitioner-appellee, cross-appellant.
 William McEuen, Asst. Atty. Gen. (Hal Stratton, Atty. Gen., with him on the briefs) Santa Fe, N.M., for respondent-appellant, cross-appellee.
 Before LOGAN, SETH and ANDERSON, Circuit Judges.
 STEPHEN H. ANDERSON, Circuit Judge.
 
 
 1
 Petitioner, Carl Edwin Case, was tried in state court and convicted on a jury verdict of felony murder and criminal sexual penetration in the first degree. Following an unsuccessful state appeal[1] Case sought federal habeas relief. The district court conditionally granted Case's petition on one ground, and denied relief on another. Both parties have appealed.
 
 
 2
 The issue upon which Case prevailed involves an allegation of jury misconduct. Case asserts that the state trial court violated his constitutional rights when it refused to question the jury after its verdict, with respect to allegations of internal jury misconduct "and/or" improper external influence. Case's Answer and Reply Brief at 2. Those allegations arose from evidence that one or more jurors crossing the street to the parking lot after the last full day of trial may have either said or heard the following two comments: "[t]hat little gal [a state rebuttal witness] was lying on the stand this afternoon, that was obvious;" and "[h]e will be found guilty, there is no other way it can go."
 
 
 3
 The second issue arises from the state trial court's denial of a continuance toward the end of the trial to enable the defense to bring in a newly-discovered witness. The witness supposedly would testify to having seen the victim several days after the date upon which the murder was charged to have occurred.
 
 
 4
 The district court referred Case's petition to the United States Magistrate for recommended findings and disposition. Based solely upon his review of the state court record, the magistrate determined that by refusing to hold a hearing at which the jurors could be examined, the state trial court "effectively denied Petitioner the opportunity to present his claim of bias and prejudice," thus inflicting "a wrong of federal constitutional dimension." Following a hearing at which the missing witness testified, the magistrate found against Case on the continuance issue.
 
 
 5
 The magistrate recommended that Case's petition be granted unless the state retried him within 120 days. The district court adopted the magistrate's recommendations and entered judgment accordingly. We reverse on the jury misconduct issue, and affirm on the continuance issue.
 
 I.
 JUROR MISCONDUCT ISSUE
 
 6
 A. Background.
 
 
 7
 The guilt phase of Case's trial lasted five and one-half trial days, beginning Tuesday, October 19, 1982 and ending at midday on Tuesday, October 26, 1982. The alleged incident of juror misconduct occurred Monday afternoon, October 25, apparently after court had recessed for the day. However, it did not come to light until after the guilt phase of Case's trial had concluded and the jury had returned a guilty verdict.
 
 
 8
 Deloris Reich, an individual unconnected with the trial, testified that between 4:20 p.m. and 4:40 p.m. Monday afternoon she observed "maybe a few" more than twelve people, in various groupings, cross the street during a period spanning a few minutes. R.Vol. XI at 2236, 2238, 2243-44. At another point Reich stated that "people started coming across the street, quite a few people. I don't have any idea how many. They just kept coming." R.Vol. X at 1902. They were crossing from the direction of the courthouse toward the vicinity where the jurors' cars were parked. R.Vol. XI at 2249-50. After viewing the jury the following day Reich was able to state positively that at least some members of the jury were among the people she observed crossing the street. R.Vol. X at 1903-07, 1911; R.Vol. XI at 2236-37.
 
 
 9
 As one group consisting of three or four men passed, Reich heard one of them say "[t]hat little gal was lying on the stand this afternoon, that was obvious." R.Vol. X at 1902; R.Vol. XI at 2237. At the time Reich's back was turned to the group and her attention was directed to her daughter who was in a parked vehicle, and with whom Reich had been conversing. Thus, Reich was not able to state who made the remark or who was in a position to hear it. R.Vol. X at 1902-03; R.Vol. XI at 2245.
 
 
 10
 A few minutes later as Reich was crossing the street to get to her own vehicle she passed two women, one of whom was heard by Reich to remark "[h]e will be found guilty, there is no other way it can go." R.Vol. X at 1908; R.Vol. XI at 2238. Reich's back was to the women when the remark was made, R.Vol. XI at 2246, and her attention was directed toward getting across the street. R.Vol. X at 1908. However, she turned upon hearing the remark and looked at the women, observing the side of one woman's face. R.Vol. XI at 2246.
 
 
 11
 Reich testified "I will not and cannot swear that the lady on the jury is the one that said those words, nor a man on the jury said those words." R.Vol. X at 1911. However, as indicated, Reich was firm in her conclusion that jurors were among those crossing the street, and she felt that the two ladies, one of whom made the remark in question, were members of the jury, but simply was unable to say "for absolutely sure." R.Vol. XI at 2248-49. She expressed similar feelings with respect to at least one of the men in the group from which the other remark in question had been heard. Id.
 
 
 12
 Reich, who was aware that a trial was going on, thought the two remarks in question were odd, R.Vol. X at 1914, R.Vol. XI at 2246, but did nothing about the matter until the following day, Tuesday, when she called Pam Thompson, a radio reporter friend of hers. Reich asked Thompson about the trial and was told that the jury had found Case guilty. Reich told Thompson she was not surprised by a guilty verdict "because of what I heard." R.Vol. XI at 2247.
 
 
 13
 The sentencing phase of Case's trial commenced the following day, Wednesday, October 27. Apparently Thompson had Reich come to the courthouse that morning to see if she could identify members of the jury as those whom Reich had observed crossing the street. Reich was able to identify at least eight of the jurors (inclusive of the two alternates). R.Vol. X at 1907. Thompson then broadcast an account of what Reich had overheard. The matter came to the attention of Case's counsel, who brought it up with the trial court immediately following the noon recess that same day. The court informed counsel that he had learned of the incident the previous evening, and had spoken to Reich on the telephone, but decided not to pursue the matter when Reich stated that she did not know if any jurors were involved.
 
 
 14
 Since Reich had purportedly identified some of the jurors that morning the trial court permitted representatives of the two sides to go to Reich's home to record an interview with her. R.Vol. X at 1900. A motion by defense counsel for an immediate voir dire of the still-impaneled jury was denied.
 
 
 15
 At 3:30 p.m. that same afternoon, Wednesday, October 27, one of Case's counsel, and an investigator for the state, returned to court with a tape of an interview with Reich in which she substantially recounted the events already described. The tape was played to the court and counsel in chambers. Case's counsel then moved again for a voir dire of the jury and the motion was once again denied. R.Vol. X at 1917.
 
 
 16
 The following afternoon, Thursday, October 28, after the jury had retired to deliberate on Case's sentence, the trial court held an evidentiary hearing on the jury misconduct issue. As the following exchange between the court and Case's counsel indicates, the defense was not limited in any way as to what it could present in that hearing, with the exception of a voir dire of the jury:
 
 
 17
 "MR. MITCHELL: ... And I think the first thing that comes first is presenting whatever evidence I may have in that regard, Your Honor, in addition to what was submitted to the Court yesterday on the record [referring to the tape recording of Reich's interview.]
 
 
 18
 THE COURT: I'll be frank with you, nothing was submitted to the Court yesterday insofar as I could tell. But you may submit any other evidence. And I told you at that time you could."
 
 
 19
 R.Vol. XI at 2231 (emphasis added).
 
 
 20
 Case's counsel then produced Reich, who was examined and cross-examined under oath in open court, generally repeating what she had stated in the recorded interview. No other evidence was proffered.
 
 
 21
 At the conclusion of the hearing Case's counsel moved in the alternative for a mistrial on the ground of jury misconduct, and, for the third time, that permission be granted to voir dire the jury because of the evidence presented by Reich. Both motions were denied without explanation, R.Vol. XI at 2250, although the trial court had explained at the outset of the evidentiary hearing that:
 
 
 22
 "THE COURT: I'm willing to listen to see if there was jury misconduct. And if there is jury misconduct and you can prove it to the Court, you are entitled, depending on when it occured, [sic] to a new trial, maybe to a new sentencing hearing. I don't know."
 
 
 23
 R.Vol. XI at 2232-33. See also R.Vol. IX at 1818-20. And, earlier, the court stated:
 
 
 24
 "But this is the way the lady sounded to me, and it just--we don't know how many people are crossing the street.... She doesn't know anything about this as to who said what to whom, and there isn't any sense in pushing it."
 
 
 25
 R.Vol. X at 1917 (emphasis added). Thus, it is a fair inference that the trial court found no factual basis for the claim of juror misconduct sufficient to justify a voir dire of the jurors.
 
 
 26
 Following the evidentiary hearing and the denial of Case's motions to interrogate the jury or for a mistrial, the jury was brought back into the courtroom and announced their verdict that Case not suffer the death penalty. R.Vol. XI at 2252. The court then pronounced sentence and the jury was discharged.
 
 
 27
 On appeal to the New Mexico Supreme Court the issue was stated as whether "the trial court abused its discretion by refusing to declare a mistrial or voir dire jurors following an allegation of juror misconduct." State v. Case, 676 P.2d at 246. The court declared the standard to be: "If there is no evidence of probable juror impropriety, the trial court does not abuse its discretion by refusing to voir dire the jury." Id. The court made the following findings with respect to Reich's testimony:
 
 
 28
 "A review of the record indicates that Reich was crossing the street with a group of people when she overheard the remarks but that she had no idea who made the remarks.... [S]he would not say positively that any comment she overheard was made by a juror or overheard by members of the jury. She admitted that she could not say that any juror said anything.... Reich was equivocal as she could not say that any juror made or heard the remarks in question."
 
 
 29
 State v. Case, 676 P.2d at 246-47 (emphasis added). Based on its findings, the Supreme Court concluded:
 
 
 30
 "There was insufficient proof of juror misconduct to overcome the presumption that the jury obeyed its instructions. We therefore find that the trial court did not abuse its discretion by refusing to voir dire the jury, nor by denying a motion for mistrial."
 
 
 31
 Id. at 247.
 
 
 32
 Case's initial appeal to this court was remanded to the United States District Court (Nos. 85-2937 and 86-1042, unpublished, March 6, 1987), for an evidentiary hearing at which either party could supplement the record on the jury misconduct issue. A hearing was held, but neither Case nor the state offered anything further. Thus, Case's claim stands solely on the state court record and findings.[2]
 
 
 33
 B. Discussion.
 
 
 34
 Our review of the district court's decision centers on the effect and the deference, if any, to be accorded to the findings of the state courts. The magistrate's report, adopted by the district court, omitted any discussion of the state court findings. The state argues that the district court improperly failed to accord a presumption of correctness to those findings. Case contends that his petition presents only a constitutional question of law, or one of mixed fact and law, requiring a de novo review of the record. More particularly, Case argues that the issue requires an independent federal review to determine whether there was sufficient evidence to compel a voir dire of the jurors:
 
 
 35
 "The issue in this case is not whether the jury was biased or even whether jury misconduct occurred but rather whether there was sufficient evidence of jury misconduct and the prejudicial nature of that misconduct to mandate voir dire of the jury on that subject. The ultimate issue of what amount of evidence is enough to require under the federal constitution an inquiry of the jurors is a question of law."
 
 
 36
 Case's Answer and Reply Brief at 12-13.
 
 
 37
 Sufficiency of the evidence can be considered to be a mixed question of law and fact. See Graham v. Wilson, 828 F.2d 656, 659 (10th Cir.1987), cert. denied, 484 U.S. 1069, 108 S.Ct. 1035, 98 L.Ed.2d 999 (1988); Herring v. Blankenship, 662 F.Supp. 557, 565 (W.D.Va.1987). Thus, according to Case, the state court findings are entitled to no deference.
 
 
 38
 The general rules are not in doubt. Explicit and implicit findings by state trial and appellate courts "shall be presumed to be correct," 28 U.S.C. Sec. 2254(d), unless one of seven factors listed in section 2254(d) are present, or the federal court concludes that the state court findings are not fairly supported by the record.[3] Rushen v. Spain, 464 U.S. 114, 120, 104 S.Ct. 453, 456, 78 L.Ed.2d 267 (1983); Marshall v. Lonberger, 459 U.S. 422, 432, 103 S.Ct. 843, 849, 74 L.Ed.2d 646 (1983); Sumner v. Mata (Sumner I), 449 U.S. 539, 545-47, 550, 101 S.Ct. 764, 768-769, 770, 66 L.Ed.2d 722 (1981); Baca v. Sullivan, 821 F.2d 1480, 1482 (10th Cir.1987); Redford v. Smith, 543 F.2d 726, 729-30 (10th Cir.1976).
 
 
 39
 The presumption applies to basic, primary, or historical facts and the inferences that can properly be drawn regarding them. Marshall v. Lonberger, 459 U.S. at 431-32, 103 S.Ct. at 849-50; Cuyler v. Sullivan, 446 U.S. 335, 341-42, 100 S.Ct. 1708, 1714, 64 L.Ed.2d 333 (1980) (" '[I]ssues of fact' refers 'to what are termed basic, primary, or historical facts: facts "in the sense of a recital of external events and the credibility of their narrators...." ' " (emphasis added) (quoting Townsend v. Sain, 372 U.S. 293, 309 n. 6, 83 S.Ct. 745, 755 n. 6, 9 L.Ed.2d 770 (1963))); Phillips v. Murphy, 796 F.2d 1303, 1306 (10th Cir.1986).
 
 
 40
 No presumption of correctness attaches to legal conclusions or determinations on mixed questions of law and fact. Those are reviewed de novo on federal habeas review. Sumner v. Mata (Sumner II), 455 U.S. 591, 597, 102 S.Ct. 1303, 1306, 71 L.Ed.2d 480 (1982); Chaney v. Brown, 730 F.2d 1334, 1346 (10th Cir.1984). However, the presumption of correctness will continue to apply to any findings of fact underlying mixed questions, typically "ultimate" constitutional issues such as due process. Marshall v. Lonberger, 459 U.S. at 431-32, 103 S.Ct. at 849-50; Sumner II, 455 U.S. at 597, 102 S.Ct. at 1306; Archuleta v. Kerby, 864 F.2d 709, 711 (10th Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 2108, 104 L.Ed.2d 669 (1989); Hunt v. Oklahoma, 683 F.2d 1305, 1309 (10th Cir.1982). This will even be the case when, as here, those findings might resolve or dispose of the "ultimate" mixed question. See, e.g., Baca v. Sullivan, 821 F.2d at 1482; Phillips v. Murphy, 796 F.2d at 1306.
 
 
 41
 In the broadest terms, the issue presented here is whether Case's due process rights were infringed when the trial court refused permission to voir dire the jury regarding the alleged juror misconduct. This ultimate issue of due process is a mixed question of law and fact. Cf. Chaney, 730 F.2d at 1346; Hunt, 683 F.2d at 1309. Thus, the section 2254(d) presumption does not apply to this ultimate issue.
 
 
 42
 However, whether or not the jurors made or heard the comments in question is unquestionably a matter of basic, primary, or historical fact. See Rushen v. Spain, 464 U.S. at 120, 104 S.Ct. at 456. That is especially true where, as here, the fact determination necessarily included an evaluation of the demeanor and credibility of the sole witness, Deloris Reich. Questions of witness credibility are usually considered to be issues of fact. See Brown v. Allen, 344 U.S. 443, 506, 73 S.Ct. 397, 445, 97 L.Ed. 469 (1953). The state trial court was in a far better position than any other tribunal to assess the credibility of Reich, having taken her live testimony. Such practical considerations are relevant to distinguishing issues of fact and law. As the Supreme Court suggested in Miller v. Fenton, 474 U.S. 104, 113-14, 106 S.Ct. 445, 451-52, 88 L.Ed.2d 405 (1985):"[T]he decision to label an issue a 'question of law,' a 'question of fact,' or a 'mixed question of law and fact' is sometimes as much a matter of allocation as it is of analysis. [Citation omitted]. At least in those instances in which Congress has not spoken and in which the issue falls somewhere between a pristine legal standard and a simple historical fact, the fact/law distinction at times has turned on a determination that, as a matter of the sound administration of justice, one judicial actor is better positioned than another to decide the issue in question."
 
 
 43
 See also Graham v. Wilson, 828 F.2d 656, 659 (10th Cir.1987), cert. denied, 484 U.S. 1069, 108 S.Ct. 1035, 98 L.Ed.2d 999 (1988).
 
 
 44
 As our summary of the record discloses, the state courts both explicitly and implicitly determined that at best Reich's testimony was equivocal and uncertain. "[S]he could not say that any juror made or heard the remarks in question." State v. Case, 676 P.2d at 247.
 
 
 45
 Case urges that the testimony was enough to trigger a constitutional requirement for further investigation by way of a voir dire of the jurors. We disagree. Giving full deference to the state's findings, Reich's testimony supports nothing more than speculation and conjecture. No constitutional duty to resort to the drastic step of a post-verdict voir dire of a jury can arise on evidence which raises nothing more than a mere possibility of misconduct. See Tanner v. United States, 483 U.S. 107, 126, 107 S.Ct. 2739, 2750, 97 L.Ed.2d 90 (1987).
 
 
 46
 Although Case invokes virtually all of the exceptions to the presumption of correctness under 28 U.S.C. Sec. 2254(d), we conclude that none apply. Other than the fact that the trial judge declined to voir dire the jurors regarding the alleged misconduct, Case can identify absolutely no shortcomings in the procedure by which the material facts were investigated, developed, and resolved. The judge gave Case every opportunity to investigate the incident, using nonjuror sources. Case received a full, fair, and adequate evidentiary hearing to present his arguments. After hearing all the testimony and arguments presented on the issue, the trial judge ruled against Case on the merits, and that was affirmed by the state supreme court. On federal habeas review Case was given a further chance to present evidence on the jury misconduct issue and chose not to do so. With respect to the final exception under section 2254(d), despite Case's argument to the contrary, our independent review of the state court record satisfies us that the factual determinations by the state courts are "fairly supported." In short, no section 2254(d) exception applies to diminish or avoid the statutory presumption of correctness which we must accord to the state court findings.
 
 
 47
 Finally, if a federal court seeks to avoid the presumption under one of these eight exceptions, it must explain its reasons in writing. Sumner I, 449 U.S. at 551, 101 S.Ct. at 771 ("[W]e now hold that a habeas court should include in its opinion granting the writ the reasoning which led it to conclude that any of the first seven factors were present, or the reasoning which led it to conclude that the state finding was 'not fairly supported by the record.' "). The federal magistrate failed to explain clearly, as required by Sumner I, the reasons why he chose to overlook the section 2254(d) presumption. In fact, no reference to section 2254(d) is made at all. Even assuming the magistrate did consciously consider the import of section 2254(d) but found the presumption not to apply because of one of the enumerated exceptions, we are unsure which exception the magistrate intended. We do not believe the magistrate's findings, adopted by the district court, fulfilled the directives of Sumner I, and Smith v. Phillips, 455 U.S. 209, 218, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982).
 
 
 48
 According the full presumption of correctness to the state court findings on the basic and primary facts from which this issue arises we cannot conclude that the state trial court violated Case's constitutional rights when it refused to conduct a post-verdict voir dire of the jury. The district court's decision to the contrary, and which failed to set forth reasons why the presumption of correctness should not apply, is erroneous.
 
 II.
 
 49
 In his petition to the district court Case also alleged that he was denied his right to present evidence in his own defense when he was denied a continuance to obtain the testimony of a witness, Michelle Kent, who was alleged to have seen the victim a few days after the date upon which the victim was supposed to have been murdered. After a hearing at which Ms. Kent testified, the magistrate concluded that Kent's tentative identification testimony would not have been sufficient to create a reasonable doubt that did not otherwise exist in the minds of the jurors. Therefore, Case was not materially prejudiced by the trial court's refusal to grant a continuance. The district court adopted the magistrate's recommendation, and denied Case's petition on this issue.
 
 
 50
 As previously indicated, the guilt phase of Case's trial began on Tuesday, October 19, 1982, and concluded at midday on Tuesday, October 26, 1982. On Friday afternoon, October 22, 1982, during the case-in-chief for the defense, Case's counsel learned that a woman may have seen the victim alive after the date upon which she was alleged to have been murdered. Counsel represented to the court that the witness, who turned out to be Michelle Kent, was unavailable and that counsel did not know her whereabouts, although an investigator was attempting to find out that information. Case's counsel then stated to the court: "I doubt very seriously the Court would grant us a continuance to find this particular witness. If the Court is going to grant us a continuance, that is great and I would move for one on this particular witness, but the declarant is unavailable.... We have been unable to locate her." R.Vol. VII at 1355. A second request for a continuance was made the following Monday, after the defense had rested and the state had completed its rebuttal. R.Vol. VIII at 1573-75. Case's counsel represented to the court at that time that Michelle Kent had been located, and he moved for a continuance, "to rent a plane, or whatever, to fly that girl back out here so I can put her on the stand." R.Vol. VIII at 1574. Counsel then made a proffer that Kent would testify "she did see the victim on the sixth day of January, five days after her alleged murder, and that the victim was alive and well, and that Kent did recognize her." Id. The state objected on the ground, among other things, "that the defense was asking for an opportunity to reopen its case." Id. at 1575. The court thereafter denied the motion for a continuance. The third request for a continuance came the next day, midway through surrebuttal. At that time defense counsel was still seeking time to prepare a witness certificate. R.Vol. VIII at 1613-15. The trial judge again denied the motion and stated that if the defense had spent as much time investigating as they had in filing thirty motions right before the trial they might have found the witness sooner. R.Vol. VIII at 1616.
 
 
 51
 Kent testified at the hearing on this issue before the United States Magistrate. She stated that she knew the victim, Nancy Mitchell, pretty well, having gone to school with her during the several months prior to her death. Kent and Mitchell were two of the eight cheerleaders for the school, practicing together daily, and traveling together to football games at least once a week. In addition, Mitchell had taken Kent home "a lot of times," and Kent visited the Mitchell home on two or three occasions. Kent further testified that Mitchell had "real blonde, blonde hair and it was real straight." She also described it as "white, real white." EHT at 11.
 
 
 52
 With respect to the incident in question, Kent testified that a few days, maybe a week, after January 1, 1982, she saw a woman whom she believed to be Nancy Mitchell. On that occasion, Kent was standing with Tammie Simmons in front of her house on the west side of Halgaino, three houses south of Church Street, a four lane roadway. The two women heard someone honk a car horn. They looked in the direction of the noise. Kent saw a person for a few seconds at least 100 feet away, driving a blue car, which was moving onto Church Street from the drive-through at the Pizza Mill, which was located on the northeast corner of the intersection. The woman driving the car waved. And, she turned herself towards Kent such that Kent could see her hair and part of her face. Kent testified:
 
 
 53
 "[W]e heard someone honk and we looked and she was waving, and she had blonde hair, and it looked like her, I am not for sure it was, but it looked like her, and she was waving at us, so I said, 'Look, there is Nancy' or 'It looks like Nancy' because she was missing no one had seen her, and so we waved."
 
 
 54
 EHT at 10. Kent acknowledged that Mitchell's car was a gold Camaro, not the blue car which Kent observed. EHT at 15.
 
 
 55
 After listening to Kent's testimony, and observing her demeanor on the witness stand, the magistrate found that Kent's testimony was equivocal, and called attention to the following excerpt from Kent's testimony:
 
 
 56
 "Q. Now, Ms. Kent, you are not at all sure this was Nancy Mitchell, are you?
 
 
 57
 A. It looked like her. I don't know if it was or not.
 
 
 58
 Q. You don't know if it was or not?
 
 
 59
 A. No.
 
 
 60
 Q. It could have been someone else?
 
 
 61
 A. It could have been.
 
 
 62
 Q. You are uncertain as to whether it was Nancy Mitchell or not?
 
 
 63
 A. Uh-huh.
 
 
 64
 Q. Have you ever told anyone you were positive it was Nancy Mitchell?
 
 
 65
 A. No.
 
 
 66
 Transcript at 20-21. On re-direct examination, Kent responded as follows:
 
 
 67
 Q. How well do you know Nancy Mitchell?
 
 
 68
 A. Pretty well.
 
 
 69
 Q. Okay. And you saw this person, you saw her hair and at least half of her face; is that right?
 
 
 70
 A. Uh-huh.
 
 
 71
 Q. Okay. Let me put it this way: Would you say that you were pretty sure that it was Nancy Mitchell.
 
 
 72
 A. It looked a lot like her.
 
 
 73
 Transcript at 24."
 
 
 74
 Amended Magistrate's Proposed Findings and Recommended Disposition at 3-4.
 
 
 75
 With respect to cases on direct appeal, we review the district court's decision to deny a continuance for abuse of discretion, and do not reverse unless we conclude that the denial was arbitrary or unreasonable and materially prejudiced the appellant. See United States v. West, 828 F.2d 1468, 1469 (10th Cir.1987). In West, we stated that "[t]he determination whether 'the denial of a continuance constitutes an abuse of discretion turns largely upon the circumstances of the individual case.' " Id. at 1469-70 (quoting United States v. Flynt, 756 F.2d 1352, 1359 (9th Cir.1985)). We thereafter listed several factors which may be considered in determining whether a denial of a continuance is arbitrary and unreasonable, including:
 
 
 76
 "the diligence of the party requesting the continuance; the likelihood that the continuance, if granted, would accomplish the purpose underlying the party's expressed need for the continuance; the inconvenience to the opposing party, its witnesses, and the court resulting from the continuance; a need asserted for the continuance and the harm that appellant might suffer as a result of the district court's denial of the continuance. No single factor is determinative and the weight given to any one may vary, depending on the extent of the appellant's showing on the others."
 
 
 77
 United States v. West, 828 F.2d at 1470 (citations omitted).
 
 
 78
 However, when a denial of a continuance forms a basis of a petition for a writ of habeas corpus, not only must there have been an abuse of discretion, but "it must have been so arbitrary and fundamentally unfair that it violates constitutional principles of due process." Hicks v. Wainwright, 633 F.2d 1146, 1148 (5th Cir.1981). See Nieto v. Sullivan, 879 F.2d 743, 749 (10th Cir.1989) ("The standard that governs in a habeas proceeding 'is "the narrow one of due process, and not the broad exercise of supervisory power." ' " (quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting in turn Donnelly v. DeChristoforo, 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)))). "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process." Ungar v. Sarafite, 376 U.S. 575, 589, 84 S.Ct. 841, 850, 11 L.Ed.2d 921 (1964).
 
 
 79
 The parties devote a great deal of argument to questions relating to the diligence of Case's counsel, usefulness of the continuance, inconvenience, and other factors listed in West. However, we must focus on Case's need for a continuance and the prejudice or lack of prejudice resulting from its denial, in the context of a fundamental fairness evaluation.
 
 
 80
 We have read the entire record in this case and are convinced that the trial court's denial of a continuance did not undermine the fundamental fairness of Case's trial. Case argues that Kent's testimony was unique and absolutely fundamental to his defense. Although he was able to present two other witnesses, a husband and wife, who stated that they had seen the victim, Mitchell, at a party on a date subsequent to the alleged date of her murder, that testimony had been discredited by evidence from the state medical examiner that Mitchell could not have been alive on the date of the party. Kent's alleged sighting was within a shorter and more credible time frame.
 
 
 81
 However, the tentative and equivocal nature of Kent's testimony with respect to the fleeting sighting of a girl in a moving automobile, which was not Mitchell's, more than one hundred feet away from Kent, must be evaluated in the context of the entire trial. Case's own testimony placed him in the company of the victim and at the scene of the incident in question. There was testimony that prior to that time Case and others had discussed taking the victim to a location and forcing her to engage in sexual intercourse. There was eyewitness testimony that at the place and time in question, the victim was assaulted sexually by Case and others, and beaten into a state of unconsciousness. According to eyewitness testimony Case assisted in dragging the unconscious victim away and abandoning her. In view of this and other evidence, we agree with the magistrate's finding that "Kent's tentative identification testimony would not have been sufficient to create a reasonable doubt that did not otherwise exist in the mind of the jurors." Accordingly, it cannot be said that the district court erred in its conclusion that Case's constitutional rights were not violated by the trial court's refusal to grant a continuance to obtain Kent's testimony.
 
 III.
 CONCLUSION
 
 82
 We have carefully considered all of the arguments of the parties, addressing those we deemed necessary. For the reasons stated herein, we AFFIRM the denial of Case's petition for a writ of habeas corpus on the continuance issue, and REVERSE the conditional grant of the writ on the juror misconduct issue.
 
 
 
 [1]
 State v. Case, 100 N.M. 714, 676 P.2d 241 (1984)
 
 
 [2]
 Because the magistrate did not receive any live testimony on the issue, but merely made findings based upon a review of the state record, the "clearly erroneous" standard does "not apply with full force" to the magistrate's findings, Archuleta v. Kerby, 864 F.2d 709, 711 n. 2 (10th Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 2108, 104 L.Ed.2d 669 (1989); Castleberry v. Alford, 666 F.2d 1338, 1342 n. 2 (10th Cir.1981), or, more accurately stated, the findings are not given the special deference normally accorded findings based upon a court's assessment of witnesses' credibility. See Anderson v. Bessemer City, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985)
 
 
 [3]
 28 U.S.C. Sec. 2254(d) lists the following factors by which the presumption of correctness may be avoided:
 "(1) that the merits of the factual dispute were not resolved in the State court hearing;
 (2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;
 (3) that the material facts were not adequately developed at the State court hearing;
 (4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;
 (5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;
 (6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or
 (7) that the applicant was otherwise denied due process of law in the State court proceeding;
 (8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record...."