UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

JOHN WALTER CASTRO, SR.,

Petitioner - Appellant,

v.

RON WARD,

Respondent - Appellee.

No. 97-6179

ORDER

Filed March 2, 1998

Before **PORFILIO**, **ANDERSON**, and **BALDOCK**, Circuit Judges.

The opinion filed in this case on February 18, 1998, is withdrawn.  The court's corrected opinion is filed herewith.  Please destroy all copies of the previously filed opinion.

Entered for the Court
PATRICK FISHER, Clerk of Court


by:

Philippa Stephens
Deputy Clerk

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 2 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JOHN WALTER CASTRO, SR.,

        Petitioner - Appellant,

v.

RON WARD,

        Respondent - Appellee.

No. 97-6179

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 95-CV-1526)**

Robert Wade Jackson (Steven M. Presson with him on the briefs), Jackson & Presson, P.C., Norman, Oklahoma, for Appellant.

William L. Humes, Assistant Attorney General (W. A. Drew Edmondson, Attorney General of Oklahoma, with him on the brief), Oklahoma City, Oklahoma, for Appellee.

Before PORFILIO, ANDERSON, and BALDOCK, Circuit Judges.

**ANDERSON**, Circuit Judge.

Petitioner John Walter Castro, Sr. appeals the denial of his petition for a writ of habeas corpus seeking to overturn his conviction and sentence of death for first degree murder.  We affirm.

## BACKGROUND

On June 6, 1983, Mr. Castro was arrested for the armed robbery and felony-murder of Rhonda Pappan in Ponca City, Oklahoma.  He was placed in the Kay County jail.  In August of 1983, Mr. Castro's cell mate in Kay County, Steven Gregory, told a district attorney investigator that Mr. Castro had drawn a map detailing the location of a body.  Gregory later led authorities to the body of Beulah May Cox, the woman for whose murder Mr. Castro was convicted and sentenced to death in this case.  As revealed by Mr. Castro's own testimony, the basic facts of the crime are the following:  Mr. Castro accepted a ride from Ms. Cox and became angry at her as they drove around in her car and talked.  After asking her to drive down a secluded dirt road, Mr. Castro pulled a gun, directed Ms. Cox away from her car, and, while she sat with her back to him, Mr. Castro shot her in the head three times at close range.

On September 26, 1983, an information charging Mr. Castro with the Cox murder was filed in Noble County, Oklahoma.  On September 30, 1983, Mr. Castro confessed to the Cox murder to law enforcement officials.  On

November 8, 1983, the State of Oklahoma filed its bill of particulars against Mr. Castro for the Cox murder and theft of her car, charging he committed the murder to avoid arrest or prosecution and that he posed a continuing threat to society.  He pled not guilty.  On April 17, 1984, Mr. Castro was found guilty in Kay County of the armed robbery and felony-murder of Ms. Pappan, and sentenced to death.[1]  On June 1, 1984, Mr. Castro was arraigned on the murder and theft charges involving Ms. Cox.

After voir dire, trial to the jury on the Cox murder took place between March 4 and March 11, 1985.  At the conclusion of the first stage of the trial, on the same day the trial ended, the jury found Mr. Castro guilty of first degree murder and larceny of an automobile.  At the conclusion of the second stage, the jury sentenced him to death on the murder charge and 20 years' imprisonment on the larceny charge.  The statutory aggravator supporting the death sentence was the "continuing threat" aggravator of Okla. Stat. Ann. tit. 21, § 701.12(7).

Mr. Castro's conviction and sentence were affirmed on direct appeal. Castro v. State, 844 P.2d 159 (Okla. Crim. App. 1992), cert. denied, 510 U.S. 844 (1993).  Mr. Castro sought post-conviction relief in state court, which was denied.

---

[1]This court ultimately vacated Mr. Castro's death sentence because "the district court erred in concluding due process did not require the appointment of an expert psychiatrist during the sentencing phase of Mr. Castro's trial" and that error was not harmless.  Castro v. Oklahoma, 71 F.3d 1502, 1515-16 (10th Cir. 1995) ("Castro I").

The Oklahoma Court of Criminal Appeals affirmed. Castro v. State, 880 P.2d 387 (Okla. Crim. App. 1994), cert. denied, 514 U.S. 1024 (1995).

Mr. Castro then filed this habeas petition in federal district court on December 15, 1995. The court denied his request for discovery and for an evidentiary hearing, finding that "the facts underlying Petitioner's constitutional claims [were] fully developed in his state court proceedings." Memorandum Op. and Order at 1, R. Vol. I at Tab 24. The court denied his habeas petition on May 1, 1997, and granted a certificate of appealability. The Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214, does not apply. See Duvall v. Reynolds, 131 F.3d 907, 915-16 (10th Cir. 1997).

Mr. Castro raises the following issues on appeal: (1) Oklahoma's continuing threat aggravator is unconstitutionally vague and overbroad on its face and as applied; (2) Oklahoma failed to determine whether Mr. Castro was competent prior to trial; (3) Steven Gregory, the cell mate to whom Mr. Castro made incriminating statements and who testified against Mr. Castro, was an agent of the state and his testimony was admitted in violation of Mr. Castro's constitutional rights; (4) Mr. Castro was denied his right to a speedy trial by the eight month delay between the date the information was filed against him and his arraignment, and by the sixteen month delay between the filing of the information and his trial; (5) statements Mr. Castro made to various state officials were

- 4 -

inadmissible, for various reasons; (6) erroneous jury instructions were given in the penalty stage of the trial, which allowed the jury to believe that it had to unanimously find any mitigating factors; (7) a venire person, Patricia Lumbers, was improperly removed for cause; (8) the jury instruction on insanity was improper; (9) evidence of Mr. Castro's likelihood of rehabilitation was improperly admitted during the first (guilt/innocence) phase of the trial; (10) Mr. Castro was denied funds to hire an investigator and denied sufficient funds for a mental health expert; (11) Mr. Castro's trial and appellate counsel were ineffective; (12) the state court and the federal district court failed to conduct an evidentiary hearing; (13) cumulative errors rendered the entire trial unconstitutional; and (14) the district court erred in not permitting discovery.

## DISCUSSION

As a federal court conducting a review in habeas of state court determinations, our role is "'secondary and limited.'" Hatch v. Oklahoma, 58 F.3d 1447, 1453 (10th Cir. 1995). "Although we review legal conclusions de novo, a state court's factual findings are entitled to a presumption of correctness." Id. (citations omitted); see also Case v. Mondragon, 887 F.2d 1388, 1393 (10th Cir. 1989). Mixed questions of law and fact are reviewed de novo, but "the

presumption of correctness will continue to apply to any findings of fact underlying mixed questions." Case, 887 F.2d at 1393.

## I.    "Continuing Threat" Aggravator

As we acknowledged in Castro I, Oklahoma is a weighing state. "Accordingly, the jury must find the existence of at least one aggravating factor beyond a reasonable doubt and then must conclude the aggravating circumstance or circumstances outweigh any mitigating evidence presented by the defendant before it may recommend a death sentence." Castro I, 71 F.3d at 1506 n.3 (citing Okla. Stat. Ann. tit. 21, § 701.11-.12). Among the statutory aggravating factors in Oklahoma is "[t]he existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Okla. Stat. Ann. tit. 21, § 701.12(7). Mr. Castro challenges that factor, arguing it is vague and overbroad, both on its face and as applied.

This court recently upheld the constitutionality of that aggravating factor in Nguyen v. Reynolds, 131 F.3d 1340 (10th Cir. 1997), stating "the continuing threat factor used in the Oklahoma sentencing scheme does not violate the Eighth Amendment." Id. at 1354. In so holding, we noted that the Supreme Court rejected a vagueness challenge to a "nearly identical" aggravating factor in Jurek v. Texas, 428 U.S. 262, 274-75 (1976). Id. at 1353. The State, and Oklahoma

courts, in their consistent rejection of the argument that the "continuing threat" aggravator is unconstitutional, rely on Jurek. Mr. Castro attempts to distinguish Jurek on a number of grounds, one of which we rejected in Nguyen—that Texas uses the continuing threat aggravator only in the selection process, not in both the eligibility and selection process, as Oklahoma does.

In Nguyen we also explained why we rejected the reasoning of Williamson v. Reynolds, 904 F. Supp. 1529 (E.D. Okla. 1995), aff'd in part, reversed in part, 110 F.3d 1508 (10th Cir. 1997), in which the district court held that the "continuing threat" aggravator was vague and violated due process. Id. at 1571. Mr. Castro understandably places great reliance upon Williamson, and urges us to adopt its reasoning. As Nguyen points out, Williamson failed to discuss or even cite Jurek. Nguyen, 131 F.3d at 1354. And Tuilaepa v. California, 512 U.S. 967 (1994) makes clear that Jurek held that Texas' continuing threat aggravator was not unconstitutionally vague: the Court noted "the numerous factors we have upheld against vagueness challenges" including, in Jurek, holding that the continuing threat aggravator "is not unconstitutionally vague." Id. at 974.

Mr. Castro further attempts to distinguish Nguyen by arguing that it only addressed the issue of whether the "continuing threat" aggravator was unconstitutionally vague, but that it did not address the separate issue of whether the aggravator is unconstitutionally overbroad as applied by the Oklahoma courts.

As the Supreme Court has stated, there are two phases in a death penalty proceeding:  the eligibility decision and the selection decision.  Tuilaepa, 512 U.S. at 971.  For a defendant to be eligible for the death penalty in a homicide case, "the trier of fact must convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase."  Id. at 972.  The aggravating circumstance must satisfy two criteria to be constitutional.  "First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder."  Id.; see also Brecheen v. Reynolds, 41 F.3d 1343, 1360 (10th Cir. 1994).  "Second, the aggravating circumstance may not be unconstitutionally vague."  Tuilaepa, 512 U.S. at 972.

While it is true that the opinion in Nguyen focused primarily on the question of whether the "continuing threat" aggravator was unconstitutionally vague, it specifically concluded by holding "[b]ecause the continuing threat factor is neither unconstitutionally vague nor applicable to every defendant convicted of murder in the first degree, it is properly used during both the eligibility decision and the selection decision."  Nguyen, 131 F.3d at 1354 (emphasis added).  Thus, Nguyen controls and compels us to reject Mr. Castro's argument concerning the

"continuing threat" aggravator. We decline Mr. Castro's invitation to seek initial en banc review to overrule Nguyen.[2]

## II.     Mr. Castro's Competency

Mr. Castro argues his due process rights under the Fourteenth Amendment were violated because the court failed to determine his competency to assist counsel, thereby forcing him to defend himself while incompetent. Mr. Castro's argument is based in part upon what happened in the Kay County proceedings involving the Pappan murder trial. In that case, Mr. Castro's appointed attorney, Kenneth Holmes, told the court prior to trial that he had serious doubts about Mr. Castro's ability to assist him in his defense, and that Mr. Castro needed a psychiatric evaluation. The Kay County court found that there was a genuine doubt about Mr. Castro's competency and ordered him committed to the Eastern State Hospital for an evaluation. Doctor R. C. Garcia, Chief Forensic Psychiatrist at Eastern Hospital, reported to the court that Mr. Castro was competent to stand trial. Mr. Castro appears to argue that, because questions about Mr. Castro's competency arose in the Pappan murder trial in Kay County, Mr. Castro's Noble

---

[2]Mr. Nguyen has filed no motion seeking en banc review. However, in a brief filed with this court, he suggested such review. We have recently denied a petition for rehearing with en banc suggestion in Nguyen.

County attorney, Royce Hobbs, should have raised the issue of competency and sought a competency evaluation and hearing in this case.

A defendant has a due process right not to be tried while incompetent. United States v. Williams, 113 F.3d 1155, 1159 (10th Cir. 1997). "Competence to stand trial requires that a defendant have 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and 'a rational as well as factual understanding of the proceedings against him.'" Nguyen, 131 F.3d at 1346 (quoting Dusky v. United States, 362 U.S. 402, 402 (1960)). If the trial court failed to conduct a competency hearing at the time of trial, "[a] habeas petitioner is entitled to a nunc pro tunc evidentiary hearing for the purpose of proving that he was incompetent at the time of trial only when he makes a showing by clear and convincing evidence to raise threshold doubt about his competency." Id. (citations and quotations omitted). Mr. Castro can make such a showing by "present[ing] facts sufficient to positively, unequivocally and clearly generate a real, substantial and legitimate doubt concerning his mental capacity." Id. (citations and quotations omitted).[3]

---

[3]The Oklahoma Court of Criminal Appeals held this argument procedurally barred under Okla. Stat. Ann. tit. 22, § 1086, as an issue "either raised on direct appeal or [one which] could have been raised on direct appeal but [was] not." Castro v. State, 880 P.2d 387, 388 (Okla. Crim. App. 1994). The district court determined that it had to address the merits of this claim, despite the Oklahoma court's finding of procedural bar, because ineffective assistance of counsel can constitute "cause" excusing a procedural default, and
(continued...)

In this case, neither side sought a competency hearing. Accordingly, "we must decide 'whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial.'" Williams, 113 F.3d at 1160 (quoting United States v. Crews, 781 F.2d 826, 833 (10th Cir. 1986)). The Supreme Court has described what evidence triggers the need for a competency hearing: "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but . . . even one

---

³(...continued)
Mr. Castro argues that the ineffectiveness of his appellate counsel caused the default of this issue. Thus, to analyze whether his appellate counsel was ineffective, the court felt compelled to address the merits. Additionally, Mr. Castro argues that competency to stand trial cannot be waived. The Supreme Court has described the importance of the right to not be tried while incompetent:

> "'Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so.'"

Cooper v. Oklahoma, 517 U.S. 348, 116 S. Ct. 1373, 1376 (1996) (quoting Riggins v. Nevada, 504 U.S. 127, 139-40 (1992) (Kennedy, J., concurring in the judgment)). The Court has further said "the right not to stand trial while incompetent is sufficiently important to merit protection even if the defendant has failed to make a timely request for a competency determination." Id. at 1377 n.4. We have also stated that the right cannot be waived. Nguyen, 131 F.3d at 1346 (noting that the "general rule [of procedural bar] does not apply to substantive mental competency claims"); United States v. Williams, 113 F.3d 1155, 1160 (10th Cir. 1997).

of these factors standing alone may, in some circumstances, be sufficient." Drope

v. Missouri, 420 U.S. 162, 180 (1975).

The district court rejected Mr. Castro's argument that there was evidence of

his incompetency, stating "[a]bsolutely nothing in the Noble County Court records

suggests that Castro was not capable of assisting his counsel with a reasonable

degree of rational understanding, or that he was not able to have both a rational

and factual understanding of the proceedings at the time thereof." Memorandum

Op. and Order at 28, R. Vol. I at Tab 24.[4]  We agree.

We have carefully reviewed the record in this case, and we agree with the

district court that nothing in the record raises any doubts about Mr. Castro's

competency at the time.  Nothing in his testimony suggests that he was

incompetent, nor does his attorney ever give any indication that he had doubts

about his competency.  Without such evidence in *this* case, the mere fact that

questions about his competency were raised in the Pappan murder case does not

automatically require an inquiry into his competency in this case.  Accordingly,

---

[4]It appears the district court mistakenly thought the record showed that "Castro was evaluated by two (2) mental health professionals other than Dr. Garcia prior to the proceedings in Noble County." Memorandum Op. and Order at 26 n.53, R. Vol. I at Tab 24.  In fact, the transcript of the pre-trial proceedings to which the district court referred show that the two evaluations were those performed prior to the *Kay County* proceedings, by "the staff of Eastern State Hospital at Vinita" and by "Doctor Bill Hamilton, the M.D. psychiatrist of Ponca City, Oklahoma," R. Vol. Pre-Trial Mots. at 85, for the purpose of determining Mr. Castro's competency to be tried for the Pappan murder.  There were no separate competency evaluations done for the Cox murder trial.

no error resulted from the failure to conduct an evidentiary hearing on, or make further investigation into, his competency to stand trial.

### III.    Whether Gregory Was an Agent of the State

Mr. Castro claims that Steven Gregory, the cell mate to whom he made incriminating statements, was a government informant who deliberately elicited information from him, in violation of his Fifth, Eighth, and Fourteenth Amendment rights. Mr. Castro filed a motion to suppress Gregory's statements. At a pre-trial hearing on that motion, the trial court found that Gregory was not an agent of the State. Mr. Castro raised this argument in his direct appeal, and the Court of Criminal Appeals held as follows:

> Although Gregory was looking for favorable treatment from the district attorney's office when he provided the information on appellant, there was no evidence presented of any expressed or implied relationship between Gregory and the State as relates to appellant. Therefore, we hold that Gregory was not acting as an agent for the State, and therefore the trial court did not err in failing to suppress his testimony.

Castro v. State, 844 P.2d 159, 170 (Okla. Crim. App. 1992) (citations omitted).

"[T]he Supreme Court has held that an individual who stands indicted of a crime is denied his right to counsel when agents of the state circumvent that right by 'deliberately elicit[ing]' inculpatory statements from him in the absence of his counsel, absent a voluntary and knowing waiver." Bey v. Morton, 124 F.3d 524,

528 (3d Cir. 1997) (quoting <u>Michigan v. Harvey</u>, 494 U.S. 344, 348-49 (1990)). Thus, the police must do more than merely listen: "the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." <u>Kuhlmann v. Wilson</u>, 477 U.S. 436, 459 (1986).

The Oklahoma state courts, both at trial and on appeal, found no evidence supporting Mr. Castro's claim that Gregory had some arrangement or understanding with the State pursuant to which he elicited information from Mr. Castro. Those factual findings are entitled to a presumption of correctness, unless we determine that they are "not fairly supported by the record." <u>Demosthenes v. Baal</u>, 495 U.S. 731, 735 (1990) (per curiam) (quoting 28 U.S.C. § 2254(d)(8)). Mr. Castro points to nothing specific in the record refuting those factual findings; rather, he continues to rely upon the circumstance that he in fact revealed damaging information to Gregory, and Gregory's subsequent sentence was lighter than Mr. Castro claims it otherwise would have been. Those speculative accusations are insufficient to convince us that Gregory was acting as a state agent, deliberately eliciting information from Mr. Castro. We therefore reject this argument.[5]

---

[5]Nor do we find it persuasive that Gregory may have receive a lighter sentence after providing to state authorities information about Mr. Castro. The fact that he may

(continued...)

- 14 -

## IV. Speedy Trial Claim

On September 26, 1983, the State filed an information charging Mr. Castro with robbery by force or fear, larceny of an automobile, and first degree murder. He was arraigned on these charges on June 1, 1984. His trial on the Cox murder did not commence until eight months after his arraignment. He argues that the eight month delay between the filing of charges and the arraignment, as well as the sixteen month delay between the filing of charges and his trial, violated his Sixth, Eighth and Fourteenth Amendment rights. His trial counsel filed a motion to dismiss for lack of a speedy trial, arguing that the delay permitted the State to bolster its case against Mr. Castro, while similarly delaying his pursuit of an effective defense. The trial court denied the motion, although it did note that in its opinion Mr. Castro had suffered some prejudice during the eight month period between the filing of charges and the arraignment.

"'A Sixth Amendment speedy trial claim is assessed by balancing the length of the delay, the reason for the delay, whether the defendant asserted his right to a speedy trial, and whether the delay prejudiced the defendant.'" United States v. Dirden, 38 F.3d 1131, 1137 (10th Cir. 1994) (quoting United States v. Tranakos, 911 F.2d 1422, 1427 (10th Cir. 1990) (citing Barker v. Wingo, 407

---

[5](...continued)
have been rewarded for information he shared does not compel the conclusion that the information was elicited pursuant to a prior agreement between the State and Gregory.

U.S. 514, 530 (1972))). No single factor is dispositive. However, "only if the period of delay is 'presumptively prejudicial' need we inquire into the other factors." Id. (quoting Tranakos, 911 F.2d at 1427). We have declined to draw "a bright line beyond which pretrial delay will trigger a Barker analysis." Id. We have found that delays of approximately five and one-half months, eight months, and thirty months not presumptively prejudicial, while we have held that a fifteen month delay was presumptively prejudicial. Id. at 1137-38 (collecting cases). The Supreme Court has stated that "[d]epending on the nature of the charges, the lower courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year." Doggett v. United States, 505 U.S. 647, 652 n.1 (1992).

The Oklahoma Court of Criminal Appeals found that "the delay of the initial appearance on the present charges was at the request of appellant's Kay County attorney." Castro, 844 P.2d at 166. It held that Mr. Castro's speedy trial claim was procedurally barred under Okla. Stat. tit. 22, § 1086 because it was not raised on direct appeal. The federal district court addressed the merits of Mr. Castro's speedy trial claims, and rejected them, finding:

> [I]t appears the State refrained from bringing Castro to trial in Noble County for two (2) reasons: first, because Castro's attorney in the Kay County/Pappan murder case wished to conclude the proceedings in that county prior to Castro being brought to jail and to trial in the Noble County/Cox murder case; and second, because the State's officials were not certain how best to proceed with the various

- 16 -

criminal cases involving Castro. The officials apparently decided it would simplify matters, both for the State and for Castro, if criminal proceedings in Kay County were concluded before similar proceedings in Noble County were begun. There is no indication in the record that the State deliberately delayed trial in the Cox matter in order to gain any tactical or evidentiary advantage in the prosecution of its case.

Memorandum Op. and Order at 38, R. Vol. I at Tab 24.[6]

If we assume that the eight-month delay between filing of charges and arraignment, and/or the sixteen-month delay between filing of charges and trial were presumptively prejudicial, we affirm the district court's conclusion that the remaining Barker v. Wingo factors suggest that Mr. Castro's speedy trial rights were not violated.

As indicated, the record suggests the reasons for the delay all stemmed from the fact that Mr. Castro was being prosecuted for another, unrelated, murder charge, and both his attorney in that case, as well as the state officials involved in prosecuting both cases, believed it would be better to conclude the other murder proceeding before embarking on this one. Moreover, despite Mr. Castro's general allegation that the passage of time made it more difficult for him to present a

---

[6]As with issue two, regarding Mr. Castro's competency, the district court felt obligated to address the merits of this issue, despite the Oklahoma court's finding of procedural default, because Mr. Castro argues that his trial and appellate counsel's ineffectiveness caused this procedural default, and a determination of effectiveness requires an analysis of the merits. See United States v. Cook, 45 F.3d 388, 392 (10th Cir. 1995) ("When a defendant alleges his appellate counsel rendered ineffective assistance by failing to raise an issue on appeal, we examine the merits of the omitted issue.").

defense, he points to no specific prejudice he claims he suffered from the delay. He has not claimed that any specific witness or evidence was somehow rendered unavailable or less persuasive because of the passage of time. And, as the district court found, there is no evidence that the State's motivation for delaying the trial was to gain any tactical advantage over him. Rather, it appears it was to accommodate his Kay County attorney and to simplify matters for both Mr. Castro and the State. Finally, the delay did not cause Mr. Castro to be improperly incarcerated for a long period of time; he was already validly in custody on the Pappan murder charges.

## V.    Admissibility of Statements Made to State Officials

Mr. Castro claims that inculpatory statements made to three state agents were improperly admitted at his trial. The three state agents are Raymond Ham, an investigator with the District Attorney's office; Charles Blair, an agent with the Oklahoma Department of Corrections' Probation and Parole Division; and jailer Kevin Beier. The trial court conducted a Jackson v. Denno, 378 U.S. 368 (1964), hearing on each of these statements, before concluding that they were admissible.

## A. Statements to Raymond Ham

As found by the Oklahoma Court of Criminal Appeals, the following are the facts concerning the statement to Ham: On September 30, 1983—four days after charges were filed against Mr. Castro—while Mr. Castro was in the Kay County jail awaiting trial on the Pappan murder, he told the jailers that he wanted to talk. Raymond Ham, an investigator with the district attorney's office, went to see Mr. Castro. Mr. Castro told Ham that he wanted to talk and that he wanted his attorney present. After his attorney for the Pappan murder, Kenneth Holmes, arrived, Mr. Castro was notified of his Miranda rights by both Holmes and Ham, and he then confessed to the Cox murder. Mr. Castro had not received a court-appointed lawyer for the Cox murder at the time of the confession.

Mr. Castro argues that the statement was improperly admitted for two reasons: because the statement occurred during the long delay between the filing of charges and his arraignment, it is presumptively involuntary; and the attorney present during the statement, Kenneth Holmes, had a conflict of interest because he had previously represented Steven Gregory, the cell mate to whom Mr. Castro had made prior incriminating statements. The Oklahoma Court of Criminal Appeals addressed, and rejected, both of these arguments.

## 1. Conflict of Interest

The Oklahoma Court of Criminal Appeals found that "[t]he record reflects that at the time of the September 1983 confession, Mr. Holmes was not representing Gregory; Tom Rigdon had been court-appointed to represent Gregory in May 1983." Castro, 844 P.2d at 165. It concluded there was "no conflict." Id. The district court also held no conflict existed: "[T]he Court finds no evidence in the record suggesting that Castro's attorney, Holmes, was in a position of professional conflict at the time he assisted Castro. . . . Although Holmes may have represented Gregory on an unrelated matter at some earlier date, there is no indication that Holmes' representation of Castro was prejudiced by any duty owed to Gregory." Memorandum Op. and Order at 40-41, R. Vol. I at Tab 24. We agree.

"Whether multiple representation in a particular case gave rise to a conflict of interest presents a mixed question of law and fact." Edens v. Hannigan, 87 F.3d 1109, 1113 (10th Cir. 1996). Mr. Castro "has the burden of showing specific instances to support his claim of actual conflict of interest." Id. at 1114. An actual conflict of interest arises from joint representation if the interests of those jointly represented "'diverge with respect to a material factual or legal issue or to a course of action.'" Id. (quoting Cuyler v. Sullivan, 446 U.S. 335, 356 n.3 (1980)). While the typical conflict of interest case involves joint representation

- 20 -

of codefendants, it is not limited to such cases.  Rather, a defendant's right to representation free of conflicts "'extends to any situation in which a defendant's counsel owes conflicting duties to that defendant and some other third person.'" United States v. Cook, 45 F.3d 388, 393 (10th Cir. 1995) (quoting United States v. Soto Hernandez, 849 F.2d 1325, 1328 (10th Cir. 1988)).

We agree with the district court and the Oklahoma courts that the record fails to support the existence of any actual conflict of interest due to Mr. Holmes' prior representation of Gregory on unrelated charges and his representation of Mr. Castro on the Pappan murder charge.  Indeed, the evidence surrounding the confession to Ham indicates that Mr. Holmes did everything he could to assist Mr. Castro and make sure that Mr. Castro understood what he was doing. Unsubstantiated and vague allegations are insufficient to establish an actual conflict of interest.

### 2.  Voluntariness of Confession

Mr. Castro made his statement to investigator Ham four days after the information was filed against him for the Cox murder, but eight months prior to his arraignment on those charges.  He appears to argue that the length of time between the filing of the information and his arraignment renders his statement to Ham involuntary.  We have already held that Mr. Castro's speedy trial rights were

not violated by the length of time before arraignment. Furthermore, inasmuch as the confession occurred at the very beginning of the period which Mr. Castro claims was unconstitutionally long, it is difficult to see how the length of time between the filing of charges and arraignment affected the voluntariness of that confession. Moreover, as the Oklahoma courts found, and we have already indicated, the record surrounding the confession fully supports the conclusion that the statement to Ham was, in fact, voluntary.

## B. Statements to Charles Blair

Pursuant to court order from the Kay County District Court, Charles Blair, an employee of the Oklahoma Department of Corrections' Probation and Parole Division, visited Mr. Castro in January and February 1984 to conduct a presentence investigation for the Pappan murder conviction. Blair read Mr. Castro his Miranda rights, and, in the course of several interviews, Mr. Castro made incriminating statements.[7] Mr. Castro had not received a court-appointed lawyer in the Cox murder at the time the statements were made. The Oklahoma

---

[7]Blair testified that he was interviewing Mr. Castro generally concerning the Pappan murder, but that "on one instance he mentioned another crime, and at that point I stopped Mr. Castro and advised him that I was only dealing with the crime that the guilt plea had been entered or verdict, and that if he wanted to talk about other crimes, I had to advise him of his rights under the Miranda warning." R. Vol. XIX at 2741.

Court of Criminal Appeals held that the confession was "the product of [Castro's] free and unconstrained choice." Castro, 844 P.2d at 171.

Mr. Castro argues that the statements were not voluntary because he was not represented by counsel at the time they were made, because he was "most likely incompetent" at the time, and because they were made in connection with a presentence investigation conducted following his guilty plea, later withdrawn, to the murder of Ms. Pappan, in violation of Okla. Stat. tit. 12, § 2410. Under § 2410, inculpatory statements made in the course of plea negotiations are inadmissible at a defendant's criminal trial.

The district court found that:

Castro initiated conversation regarding the Cox murder during a February 21, 1984 pre-sentence interview with Blair pertaining to the Pappan murder case. When Castro mentioned the Cox murder, Blair stopped the conversation and read Castro his rights under Miranda. Once Castro stated he understood his rights, Blair allowed Castro to continue discussing the Cox case.

Memorandum Op. and Order at 44, R. Vol. I at Tab 24 (footnotes omitted). The district court accordingly held that Castro "knowingly and voluntarily waived his right to counsel at the time he made the statement to Blair." Id. Our review of the record supports that conclusion. After reading Mr. Castro his Miranda rights, Blair asked him if he understood them. Blair testified that Mr. Castro responded that he did and that he wanted to talk. Blair also testified that "it really wasn't much of an interview from that point on. . . . Mr. Castro just started talking about

- 23 -

various and sundry things." R. Vol. XIX at 2743. When asked if there was any time during the interview when Mr. Castro expressed reluctance or tried to stop the interview, Blair testified "[n]o." Id. at 2744. The district court correctly concluded that Mr. Castro's statement to Blair was freely and voluntarily given.

With respect to his competency, the district court held "there is nothing in the record that suggests [Castro] was not rational, lucid, or able to exercise judgment when he decided to continue talking to Blair after being advised of his rights." Memorandum Op. and Order at 44, R. Vol. I at Tab 24. Again, the record supports that conclusion.

Finally, with respect to the claimed violation of § 2410, the district court correctly observed that federal habeas relief is not available for violations of state law. See Matthews v. Price, 83 F.3d 328, 331 (10th Cir. 1996). Thus, even were we to conclude that § 2410 had been violated, that would provide no basis for granting Mr. Castro's habeas petition.

### C. Statements to Kevin Beier

Kevin Beier is a jailer at the Noble County jail. The Oklahoma Court of Criminal Appeals found the following with respect to Mr. Castro's statement to Beier: "On June 29, 1984, while incarcerated in the Noble County jail, at about 11:00 p.m., [Castro] began to create a disturbance. When the jailer went to

investigate, [Castro] was emotionally upset.  Without any Miranda warnings being given, [Castro] admitted to the jailer that he killed Beulah Cox." Castro, 844 P.2d at 171.[8]  The court held the statement was "the product of [Castro's] free and unconstrained choice." Id.  The federal district court found "no indication in the record that Castro ever asked Beier to call his counsel."  Memorandum Op. and Order at 47, R. Vol. I at Tab 24.

Mr. Castro argues Beier conducted the "functional equivalent" of an interrogation, with respect to which Mr. Castro never received his Miranda rights nor affirmatively waived his right to an attorney.  Even if we assume, for the sake of argument, that the admission of Mr. Castro's statement to Beier was error, we conclude it is harmless error, in light of the other confessions properly admitted and Mr. Castro's own testimony detailing the crime. See United States v. McCullah, 76 F.3d 1087, 1101 (10th Cir. 1996) (after reciting that the erroneous admission of a coerced confession is subject to harmless error analysis under

---

[8]Beier testified he said the following to Mr. Castro when he went to his cell:

[L]ook, if there is something on your mind that you need to talk about, or you got something wrong . . . fine, let's talk, and we will see what's the matter. . . . [I]f there is something bothering you, let's have a talk about it. . . . .
[I]f you have got something on your mind or on your chest, something you need to get off your chest, this is the time you need to start talking about it.

R. Vol. III at 3392-93.

<u>Arizona v. Fulminante</u>, 499 U.S. 279, 310 (1991), we concluded such admission

was harmless in light of the "overwhelming evidence to convict [the defendant] of

the crimes charged even in the absence of his coerced statements"), <u>cert. denied</u>,

117 S. Ct. 1699 (1997).


**VI.    Jury Instructions on Mitigating Evidence**

The court gave the following two instructions to the jury:

> Mitigating circumstances are those which, in fairness and mercy, may
> be considered as extenuating or reducing the degree of moral
> culpability or blame.  The determination of what are mitigating
> circumstances is for you as jurors to resolve under the facts and
> circumstances of this case.

Instruction No. 7, R. Vol. III at 153.

> If you unanimously find that one or more of the aggravating
> circumstances existed beyond a reasonable doubt and you find
> mitigating circumstances exist, you must unanimously find beyond a
> reasonable doubt that the aggravating circumstances outweigh the
> mitigating circumstances before imposing the penalty of death.

Instruction No. 10, <u>Id.</u> at 156.  Mr. Castro argues those instructions permitted one

or more jurors to believe that they must find the existence of mitigating

circumstances unanimously, in contravention of <u>Mills v. Maryland</u>, 486 U.S. 367,

384 (1988).  Mr. Castro also argues that, because Oklahoma does not require

capital sentencing juries to reduce to writing the mitigating circumstances it finds,

meaningful state, and presumably federal, appellate review is impossible.[9]

Mr. Castro raised this issue on direct appeal, and the Oklahoma Court of Criminal

Appeals rejected it on its merits, stating:

> [T]his Court has recently held that <u>Mills</u> is not applicable under
> Oklahoma law.  In the case at bar, the jury was not instructed that it
> must unanimously agree on the mitigating circumstances.  We also
> find that to require the jury to memorialize that which it considers to
> be mitigation would run afoul of <u>Mills</u>; a reasonable juror could
> interpret that requirement to be that each mitigating circumstance had
> to be unanimous as is required for the aggravators.

<u>Castro</u>, 844 P.2d at 176 (citing <u>Stiles v. State</u>, 829 P.2d 984, 997 (Okla. Crim.

App. 1992)).

In <u>Mills</u> and <u>McKoy v. North Carolina</u>, 494 U.S. 433, 440 (1990), "the

Supreme Court held that a unanimity requirement concerning mitigating

circumstances resulted in an unconstitutional death sentence."  <u>Duvall</u>, 131 F.3d

at 930.  As we stated in <u>Duvall</u>, "<u>Mills</u> and <u>McKoy</u> do not mandate that a trial

court expressly instruct a capital sentencing jury that unanimity is not required

before each juror can consider a particular mitigating circumstance."  <u>Id.</u>  Rather,

"the proper inquiry . . . is whether there is a reasonable likelihood that the jury

---

[9]The relevant instruction stated in pertinent part:

The law does not require you to reduce to writing the mitigating
circumstances you find, if any.

Instruction No. 11, R. Vol. III at 157.

has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." Boyde v. California, 494 U.S. 370, 380 (1990).

We upheld against an identical challenge the following similar instructions in Duvall:

> Instruction No. 7
> Mitigating circumstances are those which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability or blame. The determination of what are mitigating circumstances is for you as Jurors to resolve under the facts and circumstances of this case.
>
> . . . .
>
> Instruction No. 9
> If you unanimously find that one or more of the aggravating circumstances existed beyond a reasonable doubt, unless you also unanimously find that any such aggravating circumstance or circumstances outweigh the finding of one or more mitigating circumstances, the Death Penalty shall not be imposed.

Duvall, 131 F.3d at 930. We reach the same result here. Read fairly, there was no reasonable likelihood that the jury applied the challenged instructions in a way that prevented it from considering constitutionally relevant evidence, or as requiring that the jury find mitigating circumstances unanimously. The

instructions "did not preclude any of the jurors from giving effect to all of the mitigating circumstances" in Mr. Castro's favor.  Id. at 931.[10]

With respect to the instruction which did not require the jury to reduce to writing any mitigating circumstances, the Oklahoma courts have explicitly upheld the validity of that instruction on several occasions.  See, e.g., Harjo v. State, 882 P.2d 1067, 1081 (Okla. Crim. App. 1994); Paxton v. State, 867 P.2d 1309, 1326 (Okla. Crim. App. 1993) ("The absence of a list of mitigating evidence found by the jury has in no way hampered [effective appellate] review.").  We implicitly upheld it in Duvall.  131 F.3d at 930-31.  We accordingly affirm the district court's determination that the jury instructions concerning mitigating circumstances were proper.

## VII.  Removal of Venireperson

Mr. Castro argues the trial court improperly removed a venireperson, Patricia Lumbers, because of her stated views regarding the imposition of the death penalty.  He raised this issue in his direct appeal and the Oklahoma Court of

---

[10]Indeed, the instructions in Duvall are arguably more vulnerable to misinterpretation than the ones in this case, because the instructions given in this case more clearly juxtapose the unanimity requirement for the finding of aggravating circumstances with the simple requirement that mitigating circumstances be found.  Since we found that the Duvall instructions passed constitutional muster, we must conclude that the ones here do too.

Criminal Appeals rejected it on its merits, as did the federal district court. We agree.

"'[A] juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Davis v. Executive Dir., 100 F.3d 750, 777 (10th Cir. 1996), cert. denied, 117 S. Ct. 1703 (1997) (quoting Wainwright v. Witt, 469 U.S. 412, 420 (1985)). Moreover, "[a] trial judge's determination of a potential juror's bias . . . is a factual finding entitled to the presumption of correctness contained in 28 U.S.C. § 2254(d)." Id. Because issues of credibility and demeanor are crucial to the trial judge's determination, our review of that determination is quite deferential. Id. at 777-78; see also Witt, 469 U.S. at 429.

In response to questions, Ms. Lumbers stated repeatedly that she did not know whether she could actually impose the death penalty on an individual. The trial judge described her position as follows: "She does not know, no matter what this evidence is, whether she can give the death penalty." R. Vol. III, Ex. J at 2560. The judge then asked her "[n]ow am I missstating [sic] you?" to which she responded "No, sir." Id. Given our deferential standard of review, we cannot say that the judge's decision to exclude her was error.

## VIII. Insanity Instruction

Oklahoma uses the M'Naghten test to determine whether a defendant is

insane at the time of a crime. The M'Naghten test has two prongs:

> Under the first prong, the defendant is considered insane if he is
> suffering from a mental disability such that he does not know his acts
> are wrong and he is unable to distinguish right from wrong with
> respect to his acts. Under the second prong, the defendant is
> considered insane if suffering from a disability of reason or disease
> of the mind such that he does not understand the nature or
> consequences of his acts or omissions. The defendant need only
> satisfy one of these prongs in order to be found not guilty by reason
> of insanity.

Cheney v. State, 909 P.2d 74, 90 (Okla. Crim. App. 1995) (footnotes omitted).

Mr. Castro argues that the instruction given required the jury to find the defendant

met both prongs of the test, which is clearly a violation of the M'Naghten test.

Mr. Castro raised this issue for the first time in his post-conviction proceeding,

and the Oklahoma Court of Criminal Appeals considered it procedurally barred.

The federal district addressed the merits of it, as part of its analysis of Mr.

Castro's ineffective assistance of counsel claims. See supra notes 3, 6.

The instruction given stated:

> A person is insane when that person is suffering from such a
> disability of reason or disease of the mind that he does not know that
> his acts or omissions are wrong and is unable to distinguish right
> from wrong with respect to his acts or omissions. A person is also
> insane when that person is suffering from such a disability of reason
> or disease of the mind that he does not understand the nature and
> consequences of his acts or omissions.

Instruction No. 12, R. Vol. III at 115. We agree with the district court that a common sense reading of the instruction indicates that there are two separate circumstances under which the jury could find Mr. Castro insane. The instruction does not suggest that both must be found. We therefore affirm the district court's rejection of this argument.

## IX.   Evidence of Mr. Castro's Rehabilitation Potential

Mr. Castro argues that the trial court committed constitutional error by admitting the following testimony by Dr. Steven Caldwell, Mr. Castro's expert witness, in the guilt/innocence phase of his trial:

> Q.  All right.  Now in your report to Mr. Hobbs, I believe you have stated that the bottom line, literally, is that you feel that Mr. Castro will not profit from punishment in this case.
>
>        . . . .
>
> A.  The bottom line, particularly and specifically, is "the probability of Mr. John Castro profiting from punishment even with adjunctive psychotherapy is quite low."

R. Vol. XXIV at 3525-26. "[T]o be eligible for habeas relief, a petitioner must prove that the state trial court's evidentiary ruling rendered the 'trial so fundamentally unfair as to constitute a denial of federal constitutional rights.'" Duvall, 131 F.3d at 928 (quoting Hopkinson v. Shillinger, 866 F.2d 1185, 1197 (10th Cir. 1989)).  Mr. Castro argues the above testimony was so prejudicial as to

render the trial fundamentally unfair. He argued this issue in his direct appeal, where the Oklahoma Court of Criminal Appeals rejected it on its merits. The federal district court likewise rejected the argument, and we perceive no error in that conclusion.

Mr. Castro argues that the jury would have reacted to that testimony by resolving not to find him insane, for fear that he would one day be released, unrehabilitated, from incarceration. That speculation is insufficient to convince us that the trial was rendered fundamentally unfair because of Dr. Caldwell's testimony.

## X. Investigator and Mental Health Expert

Mr. Castro's trial counsel filed a motion seeking funds to hire an investigator and a mental health expert. The court denied his request for funds to hire an investigator, but offered to provide Mr. Castro with transcripts of the witnesses' testimony from the Pappan murder trial. After first stating that it would only pay for a mental health expert's testimony, the court ended up paying all the fees, for both evaluation and testimony, of Dr. Steven Caldwell, a psychologist.

Mr. Castro argues the trial court's failure to provide the defense with funds to hire an investigator to assist in the defense, and the failure to provide sufficient

funds to hire a mental health expert, violated his due process rights under Ake v. Oklahoma, 470 U.S. 68, 76 (1985). He raised the issue of the investigator in his direct appeal and the Oklahoma Court of Criminal Appeals rejected it on its merits. It is unclear whether or when he raised the issue of the mental health expert in state court. The federal district court rejected both arguments.

In Ake, the Supreme Court held that "when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one." Id. at 74. This obligation extends to the sentencing phase of a capital proceeding "when the State presents psychiatric evidence of the defendant's future dangerousness." Id. at 83; see also Brewer v. Reynolds, 51 F.3d 1519, 1528-29 (10th Cir. 1995). "We have rejected a narrow construction of Ake." Id. at 1529. We have therefore held that:

> [D]ue process requires the appointment of a mental health expert to assist the defendant in the penalty phase when the State presents evidence, psychiatric or otherwise, concerning the defendant's future dangerousness, and the defendant establishes the likelihood that his mental condition could have been a significant mitigating factor.

Id. (citing Liles v. Saffle, 945 F.2d 333, 341 (10th Cir. 1991)). Castro was accordingly clearly entitled to psychiatric assistance in both the guilt/innocence and the penalty phases of his trial.

- 34 -

Ake also requires that the State provide to indigent defendants the "'basic tools of an adequate defense or appeal.'" Ake, 470 U.S. at 77 (quoting Britt v. North Carolina, 404 U.S. 226, 227 (1971)).

> To determine what basic tools are required, we consider three factors: (1) the effect on [the defendant's] private interest in the accuracy of the trial if the requested service is not provided; (2) the burden on the government's interest if the service is provided; and (3) the probable value of the additional service and the risk of error in the proceeding if such assistance is not offered.

United States v. Kennedy, 64 F.3d 1465, 1473 (10th Cir. 1995). Accordingly, if we conclude that the investigator was a "basic tool" necessary to an adequate defense, the court erred in failing to provide funds for one. "An indigent defendant requesting appointment of an investigator or expert bears the burden of demonstrating with particularity that 'such services are necessary to an adequate defense.'" Matthews v. Price, 83 F.3d 328, 335 (10th Cir. 1996) (quoting United States v. Greschner, 802 F.2d 373, 376 (10th Cir. 1986)).

## A. Investigator

We have held before that there was no due process violation in the denial of an investigator. See Coleman v. Brown, 802 F.2d 1227, 1237 (10th Cir. 1986) (holding that allegations "that his attorney was overworked, that many witnesses were involved in the case, and that the state's resources far surpassed those of the defense" are insufficient to justify appointment of an investigator). Similarly, we

reject Mr. Castro's claim that the large number of witnesses necessitated the appointment of an investigator, particularly in light of the trial court's offer to provide him with the testimony of the witnesses from the Pappan murder trial. We affirm the district court's determination that Mr. Castro failed to meet his burden of showing that an investigator was necessary to an adequate defense. <u>See</u> <u>Matthews</u>, 83 F.3d at 335 (holding that "'undeveloped assertions that the requested assistance would be beneficial'" are insufficient to establish error in the denial of the appointment of an investigator (quoting <u>Caldwell v. Mississippi</u>, 472 U.S. 320, 323 n.1 (1985))). We turn now to his argument that the court provided insufficient funds for a mental health expert.

### B. Mental Health Expert

The Supreme Court in <u>Ake</u> required the State to "assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." <u>Ake</u>, 470 U.S. at 83. The Court also stated, "[t]his is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own." <u>Id.</u> Rather, he need only have access to "a competent psychiatrist." <u>Id.</u>

The expert who assisted in Mr. Castro's defense, Dr. Steven Caldwell, evaluated Mr. Castro and testified in the guilt/innocence, but not the penalty, phase of the trial. However, he was the last defense witness called, and his testimony occurred three days before the sentencing proceeding.[11] In Castro I, we held that Mr. Castro's due process rights were violated under Ake where there was no psychiatric testimony in either the guilt/innocence or the penalty phase of trial. In Brewer v. Reynolds, 51 F.3d 1519, 1525 (10th Cir. 1995), we criticized trial counsel's failure to recall during sentencing a mental health expert who had testified as to the defendant's sanity during the guilt/innocence phase of the trial:

> Dr. Gagliano's testimony was given at a point in the proceedings when the jury was focused on guilt or innocence rather than the sentence to be imposed. Furthermore, the testimony centered on Mr. Brewer's sanity at the time he committed the offense, and only tangentially touched upon the more chronic mental health problems . . . .

Id. Although counsel in Brewer moved to introduce that testimony into the penalty phase, counsel did little more to focus the jury's attention on it: "Counsel waived opening statement and directed his closing argument toward his disagreement with the jury's verdict of guilt and his generalized opposition to the

---

[11]Dr. Caldwell testified on Friday, March 8, 1985, closing arguments occurred on Saturday, March 9, and the jury returned its guilty verdict that day, after approximately 70 minutes of deliberation. The sentencing phase occurred on Monday, March 11.

- 37 -

death penalty." Id.  We hold that this case is distinguishable from both Castro I and Brewer.

In this case, as indicated, Dr. Caldwell testified at the end of the guilt/innocence phase, just three days before the sentencing phase.  The testimony itself related both to Mr. Castro's sanity at the time of the murder, which was relevant to the guilt/innocence phase, and to his more chronic mental health problems, which would be relevant to sentencing.[12]  Additionally, Mr. Castro's

---

[12]Dr. Caldwell testified in part as follows:

The nature of his psychopathology or emotional disturbance has a long-standing history.  This is important to distinguish between a long-standing pattern of emotional disorder, one that has lasted years, and in my opinion has a basis in Mr. Castro's early childhood, and his development, particularly through his teen years. . . . Mr. Castro's pattern of pathology has a long history to it. . . . There are two critical aspects of Mr. Castro's personality organization and pathology.  One is that overriding some of the severe emotional disorder under which he functions, is what is considered a disregard for conventional values, concerns, a lack of appropriate feeling, although intellectually aware of aspects of society, not choosing to function within those limits; not feeling appropriate guilt, remorse, pain, functioning basically as a person who disregards the values of others, or the value of others as people.  This pattern of behavior is an overriding aspect of Mr. Castro's function and has been diagnostically considered sociopathic in nature.  Underneath, if you will, that sociopathic, bright, intellectually bright man, is an aspect of psychological disfunction or psychopathology that is very intense to the point of resulting in confused thinking, inconsistent thinking, illogical thought process, distortions of judgment.  This aspect, he has a history which Mr. Castro shared, that relates to this severe kernel or core of pathology, specifically to females.  Related issues in Mr. Castro's experience and upbringing which he provided for me, had to do early on with a knowledge that his mother functioned as a prostitute.

(continued...)

counsel moved to introduce all evidence from the guilt/innocence phase of the

[12](...continued)
<u>That he was being reared primarily by his grandparents on the maternal side, who were native Americans.  That there was a very strained cold and distant relationship with the maternal grandmother; a positive, a relatively positive relationship with his maternal grandfather; a disruption in his childhood after the death of his grandfather, who may have been one of the most stable aspects of his life, when he was approximately 10 years of age.  And then a series of experiences, particularly with females, that have resulted in Mr. Castro emotionally seeing female people as hostile, threatening, cold, rejection, rejected. He relates in turn, through his view of females, with extensive aggression, hostility, and a lack of viewing females as people of concern</u>. . . .  The general emotional description that emerged through the evaluation, my evaluation, of Mr. Castro was that the overriding aspect of psychopathology would be considered that to be characterlogic [sic] and psychopathic in nature; that the underlying aspect of psychopathology would be considered a pre-psychotic condition with <u>definite indications of paranoia, or paranoid thought</u>.  The pre-psychotic condition and the aspect of <u>paranoid thinking</u> are specifically related through the evaluation to his view, interaction and conflict associated with females.

. . .

Mr. Castro related in extensive detail aspects of the female person, Mrs. Cox, who he murdered, in regard to her physical being and a confusion on his part as to her state of – the state of her body at the time right prior to the moment that reported to me shooting her.  Specifically, he talked about seeing Mrs. Cox in a squatting or sitting position, partially disrobed, and a confusion as to whether she was exhibiting herself bodily as a sexual provocative act or whether or not she were urinating or defecating, and that being one of the final thoughts that he had prior to recall of shooting her repeatedly. . . .  The confusion – the confusion of body and sexual function and provocativeness that he described is – and the hostility that resulted in the shooting of this person in the head is very consistent with the other aspects of testing that I conducted where with a female person there is gross distortion and confusion in areas of hostility, sexuality, and general aggressions when specifically tied to a female person.

R. Vol. XXIV at 3511-13, 3515-16 (emphasis added).

trial, including Dr. Caldwell's testimony, into the penalty phase. Moreover, he

recalled Dr. Caldwell's testimony several times in his closing arguments, and

urged the jury to review it. Thus, the jury was not left rudderless, the way it was

in Brewer, by the failure to recall Dr. Caldwell to testify in the penalty phase of

the trial. Nor was the jury without *any* expert mental health testimony, as was the

jury in Castro I. Accordingly, we perceive no error in the failure to recall Dr.

Caldwell to testify again in the penalty phase.

We also conclude that no Ake error occurred by virtue of the substance of

Dr. Caldwell's testimony. Mr. Castro specifically states that he has no "complaint

about the quality of Dr. Caldwell's services." Appellant's Opening Br. at 71.[13]

Rather, his complaint is "about the State's refusal to provide for adequate

psychological or psychiatric assistance, and then impeaching the services that

were rendered on the basis that they were insufficient." Id. Dr. Caldwell was

paid $500 for his evaluation of Mr. Castro, and he testified that he was to receive

---

[13]Mr. Castro thus appears to make no argument that Dr. Caldwell was unqualified because he was a psychologist, not a psychiatrist. Such an argument would fail, since we have recognized that either may provide the psychiatric assistance required by Ake. See Castro I, 71 F.3d at 1515 (in discussing whether a mental health expert was competent, we stated that "[a] forensic psychiatrist or psychologist it the proper specialist for such a task").

- 40 -

his customary hourly fee for his testimony. R. Vol. XXIV at 3494. Dr. Caldwell's testimony concerning Mr. Castro's mental status in substance conforms to the psychological evaluations done in connection with his habeas petition in the Pappan murder case, which we detailed in Castro I, and which we held needed to be presented to the sentencing jury. While not quite as detailed, and although it did not include a finding of organic brain damage, as did the evaluations described in Castro I, the testimony adequately conveyed to the jury the nature of Mr. Castro's mental problems, their origin in his past, and why they would make him particularly prone to violence towards females. The evidence of organic brain damage, while obviously relevant, is not so different in kind from the evidence Dr. Caldwell presented as to require us to find Mr. Castro's due process rights violated. In sum, this case is distinguishable from Castro I.

Were we to conclude that it was error for the jury not to have heard expert psychiatric testimony during the penalty phase, we would find it harmless error. As we held in both Castro I and Brewer, "'the denial of a psychiatric expert in violation of Ake is "trial error," and thus, subject to harmless-error analysis.'" Castro I, 71 F.3d at 1515 (quoting Brewer, 51 F.3d at 1529). We apply the Kotteakos harmless-error standard, "asking whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" Id. at 1515-16

- 41 -

(quoting Brewer, 51 F.3d at 1529 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946))).

In Castro I we held the failure to present expert mental health testimony to the sentencing jury was Ake error which was not harmless. We held it was not harmless for three reasons: (1) the jury indicated, through a question it submitted during its deliberations, that "it was not self-evident to the jury whether Mr. Castro's crime warranted the death penalty," Castro I, 71 F.3d at 1516; (2) the State relied on the "continuing threat" aggravator, which "directly placed Mr. Castro's mental status at issue," id.; and (3) the other aggravator upon which the State relied in Castro I, that the murder was "especially heinous, atrocious and cruel" was struck down by the state court on direct review, which seriously altered the balance of aggravating and mitigating circumstances, id. Two of those three circumstances are not present in this case. The jury in this case evidenced no doubt about the imposition of the death penalty, returning its verdict after only two hours of deliberation. Furthermore, no major alteration in the relative weight of aggravating and mitigating evidence materialized after the jury's verdict—the only aggravating factor upon which the State relied (the "continuing threat" aggravator) remains amply supported by evidence,[14] and the additional mitigating

---

[14]The State relied upon the following additional incidents to support the "continuing threat" aggravator: Mr. Castro's robbery and murder conviction involving

(continued...)

evidence Mr. Castro argues was erroneously excluded is largely cumulative or only marginally helpful. We are confident that the omission of the additional mitigating evidence Mr. Castro argues should have been presented to the jury did not have a "substantial and injurious effect or influence in determining the jury's verdict." Brewer, 51 F.3d at 1529 (quoting Kotteakos, 328 U.S. at 776). Thus, if there was error, it was harmless.

## XI. Ineffective Assistance of Counsel

Mr. Castro argues both his trial counsel and appellate counsel were ineffective. To prevail on such a claim, Mr. Castro must show that his counsel "'committed serious errors in light of "prevailing professional norms"' such that his legal representation fell below an objective standard of reasonableness." Duvall v. Reynolds, 131 F.3d 907, 916 (10th Cir. 1997) (quoting United States v. Haddock, 12 F.3d 950, 955 (10th Cir. 1993) (quoting Strickland v. Washington, 466 U.S. 668, 688 (1984))). We evaluate counsel's conduct from the perspective of counsel at the time, not with "the distorting effects of hindsight." Strickland, 466 U.S. at 689. Further, Mr. Castro must overcome the presumption that his

---

[14](...continued)

Ms. Pappan; two prior armed robberies; that Mr. Castro had made threats to the prosecuting attorney in the Pappan murder trial; that Mr. Castro had made a papier-mache gun while in jail; and that he had demonstrated to a jailer how a lighter could be used as a weapon. See Castro, 844 P.2d at 172 & n.5.

counsel's conduct was constitutionally effective. Duvall, 131 F.3d at 916. If he establishes his counsel was ineffective, he must then show prejudice: "'a "reasonable probability" that the outcome would have been different had those errors not occurred.'" Id. (quoting Haddock, 12 F.3d at 955 (quoting Strickland, 466 U.S. at 694)). A claim of ineffectiveness is a mixed question of law and fact which we review de novo. Id.

## A. Trial Counsel's Ineffectiveness

Mr. Castro alleges the following instances of trial counsel ineffectiveness:

**(1) Failure to seek a pre-trial competency evaluation, raise the issue of competency, and request a post-examination competency hearing.** Mr. Castro argues his trial counsel was ineffective in failing to seek a pre-trial competency evaluation, in failing to raise the issue of competency at all, and in failing to request a post-examination competency hearing. Because we have held that there was no evidence raising doubts about Mr. Castro's competency, his trial counsel was not ineffective in failing to pursue the matter. Without such evidence in this case, we refuse to hold that trial counsel was ineffective simply because Mr. Castro's competency was at issue in the previous trial–as we have said, supra, that circumstance did not mandate that Mr. Castro's competency be evaluated in this trial.

**(2) Failure to object to insanity instruction.**  Since we have held the instruction was not erroneous, counsel was obviously not ineffective in failing to object to it.

**(3) Refusal to accept the protection of <u>Ake v. Oklahoma</u>.**  <u>Ake v. Oklahoma</u> was decided a few days after Mr. Castro's trial began.  It appears from the briefs that both the judge and the State believed <u>Ake</u> required the court to provide Mr. Castro with psychiatric assistance throughout his trial.  It also appears that Mr. Castro's trial counsel did not understand <u>Ake</u> very well, and believed it had no applicability to this case.  Although the judge specifically asked him if he wanted a court-appointed psychiatrist, Mr. Castro's counsel declined, repeatedly stating that "[w]e stand on our record and own motions."  R. Vol. III, Ex. J at 3185.

As indicated, Mr. Castro did receive the services of a mental health expert, Dr. Caldwell.  We have held that Dr. Caldwell's assistance complied with <u>Ake</u>, or, if it did not, the error was harmless.  Were we to conclude that Mr. Castro's trial counsel was ineffective in failing to accept the court's "offer" of a court-appointed psychiatrist, we would find no prejudice because there is no reasonable probability that the outcome would have been different had the error not occurred.

**(4) Failure to challenge statements as involuntary due to evidence of mental infirmity.**  Although a <u>Jackson v. Denno</u> hearing was held on

the voluntariness of Mr. Castro's statements to various state agents, his counsel did not also claim they were involuntary because Mr. Castro was mentally infirm. We have held that the record supports the conclusion that the statements given were voluntary, and there is no evidence that Mr. Castro was mentally infirm at the time.[15]

**(5) Failure to object to various instructions.** Since we have held there was no error in Instructions No. 7 and No. 10 concerning mitigating circumstances, Mr. Castro's counsel was not ineffective in failing to object to them. Mr. Castro also argues that various other instructions were erroneous, and asserts that his trial counsel was ineffective in failing to object to them at trial.

He makes an additional argument about Instruction No. 7: that nothing in the instruction "advised the jury that mitigating circumstances may be anything it wished to consider 'in fairness and mercy.'" Appellant's Opening Br. at 84. We disagree. A plain reading of the instruction conveys to a reasonable juror the open-endedness of mitigating circumstances. Mr. Castro's trial counsel was not ineffective in failing to object to this instruction.

---

[15]The only statement given while Mr. Castro appeared upset or distraught was the statement to jailer Beier. We held that even if that statement was improperly admitted, the error was harmless, in light of the other admissible confessions and evidence against Mr. Castro. Were we to find that Mr. Castro's attorney was ineffective for failing to make a mental infirmity challenge to the statement to Beier, we would conclude Mr. Castro suffered no prejudice.

Nor do we agree with Mr. Castro's argument that the two instructions

following Instruction No. 7 impermissibly limited what the jury could consider as

mitigating circumstances. Instruction No. 8 provided as follows:

> Evidence has been offered as to the following mitigating
> circumstance: At the time of the murder, the capacity of the
> Defendant to appreciate the criminality (wrongfulness) of his conduct
> or to conform his conduct to the requirements of the law was
> impaired as a result of mental disease or defect.
>
> Whether this circumstance existed and whether this
> circumstance is mitigating must be decided by you.

Instruction No. 8, R. Vol. III at 154. Instruction No. 9 provided as follows:

> You are instructed that the age of the defendant as a mitigating
> circumstance may be weighed by you in determining what is the
> appropriate punishment. When the Court talks about age, it is talking
> about a young person, who through immaturity, did something that a
> reasonable person of an adult age would not have done. If you find
> that immaturity of the defendant contributed in any way to this crime,
> then this mitigating circumstance applies.

Instruction No. 9, Id. at 155. Considering the instructions as a whole, the jury

would not have felt limited in the kind of evidence or testimony it could consider

in mitigation. And we perceive no error in trial counsel's failure to seek a

specific jury instruction on each piece of mitigating evidence presented. See

Buchanan v. Angelone, No. 96-8400, 1998 WL 17109 at *5-6 (U.S. Jan. 21,

1998).

Mr. Castro also argues his attorney was ineffective in failing to object to

Instructions No. 3 and No. 10, which he claims are contradictory. He also argues

- 47 -

Instruction No. 3 is facially erroneous. Instruction No. 3 provides in pertinent part:

> Should you unanimously find that one or more aggravating circumstances existed beyond a reasonable doubt, you would be authorized to consider imposing a sentence of death.
>
> If you do not unanimously find beyond a reasonable doubt that one or more of the aggravating circumstances existed, you are prohibited from considering the penalty of death. In that event, the sentence must be imprisonment for life.

Instruction No. 3, R. Vol. III at 149. Instruction No. 10 provides:

> If you unanimously find that one or more of the aggravating circumstances existed beyond a reasonable doubt and you find mitigating circumstances exist, you must unanimously find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances before imposing the penalty of death.

Instruction No. 10, Id. at 156. There is nothing improper or contradictory in either one. Instruction No. 3 simply states the fundamental rule of death penalty eligibility—the jury must find the existence of at least one aggravating circumstance beyond a reasonable doubt before it can find Mr. Castro eligible for the death penalty. Instruction No. 10 then directs the jury that it must unanimously find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances before it can actually impose the death penalty. It in no way commands the jury to impose that penalty. Mr. Castro's counsel was not ineffective in failing to object to those instructions.

**(6) Failure to object to absence of instruction on life sentencing procedure.** Okla. Stat. tit. 21, § 701.11 at the time of Mr. Castro's trial provided that if the jury could not reach a decision on punishment in a "reasonable time," the trial judge "shall dismiss the jury and impose a sentence of imprisonment for life." Mr. Castro's trial attorney did not request an instruction so informing the jury, and Mr. Castro claims that demonstrated ineffectiveness. The Oklahoma courts have repeatedly rejected this argument. See Cleary v. State, 942 P.2d 736, 748 (Okla. Crim. App. 1997) (citing cases). We do so as well.

**(7) Mitigation preparation.** Mr. Castro argues his trial counsel was ineffective in several ways in his preparation and presentation of mitigating evidence. First, he argues he should have recalled Dr. Caldwell to testify in the sentencing phase. We have already rejected this argument.

Second, Mr. Castro claims his trial counsel failed to bring in certain information about his family and social background: the widespread and chronic alcohol and drug addiction throughout his family; that Mr. Castro may have suffered from fetal alcohol syndrome; that Mr. Castro had significant learning disabilities; that his mother was a prostitute; that his brother was thought of as "predatory and abusive" towards women; that Mr. Castro meets the diagnostic classification for paranoid personality disorder; that he has organic brain damage. See Appellant's Opening Br. at 89-90.

- 49 -

As we have previously indicated, to prevail on this claim Mr. Castro must show both ineffectiveness and prejudice. "In some cases, we proceed directly to the issue of prejudice[.]" Davis v. Executive Dir., 100 F.3d 750, 760 (10th Cir. 1996). We do so in this case, expressing no opinion on whether Mr. Castro's counsel's performance was deficient. Thus, we must determine whether there is "a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695; see also Davis, 100 F.3d at 760. We conclude there was no such probability in this case.

Some of the evidence Mr. Castro claims was not placed before the jury was in fact presented to them: Dr. Caldwell testified that Mr. Castro's mother was a prostitute and that Mr. Castro knew this at a young age; he also testified about Mr. Castro's paranoid personality and paranoid thought processes, particularly in connection with females; Mr. Castro himself testified about his brother's and his father's extensive drinking, describing his father as "a pretty bad alcoholic," R. Vol. XXVI at 3739; he also testified about his brother's paint-sniffing and his mother's and step-father's use of marijuana. More significantly, the aggravating circumstance upon which the State relied—that Mr. Castro was a "continuing threat"—was amply supported. See supra note 14. In evaluating prejudice, "[w]e

- 50 -

must 'keep in mind the strength of the government's case and the aggravating factors the jury found as well as the mitigating factors that might have been presented.'" Davis, 100 F.3d at 760 (quoting Stafford v. Saffle, 34 F.3d 1557, 1564 (10th Cir. 1994)). Given the multitude of evidence supporting the aggravating circumstance, there is no reasonable probability that the marginal additional evidence Mr. Castro claims should have been presented (largely cumulative evidence about the drug and alcohol abuse in his family, evidence that his brother was predatory and abusive towards women and evidence that organic brain damage contributed to his mental problems) would have caused the jury to reach a different result. See Brewer v. Reynolds, 51 F.3d 1519, 1527 (10th Cir. 1995).

## B. Appellate Counsel's Ineffectiveness

Castro argues his appellate counsel, Thomas Purcell, was ineffective for the following reasons: (1) failure to raise ineffective assistance of trial counsel; (2) failure to appeal competency issues; (3) failure to appeal speedy trial issue; (4) failure to appeal instruction on life sentence option; (5) failure to complain of cumulative error; and (6) "all other conduct." Because we have held that the substance of the issues involved have no merit, appellate counsel was not

ineffective, and Mr. Castro suffered no prejudice, from his appellate counsel's failure to raise them.

## XII.  Evidentiary Hearing

Mr. Castro argues he should have received an evidentiary hearing in the federal district court, in connection with what he claims are many "fact-driven" issues on which he received no hearing in state court.  The district court held that the facts underlying Mr. Castro's claims had been fully developed in the state court proceedings and denied Mr. Castro's request for an evidentiary hearing.  We agree with the district court that the relevant facts were adequately developed in state court.  In light of the clarity of the record on the issues in this case, we affirm the district court's denial of an evidentiary hearing.  See Scrivner v. Tansy, 68 F.3d 1234, 1242 (10th Cir. 1995).

## XIII.  Cumulative Error

Mr. Castro argues that, even if we do not find error in any individual ruling or action, we should find that the cumulative effect of them resulted in a fundamentally flawed proceeding.  We disagree. "Cumulative-error analysis applies where there are two or more actual errors.  It does not apply, however, to the cumulative effect of non-errors."  Hoxsie v. Kerby, 108 F.3d 1239, 1245 (10th

Cir.), cert. denied, 118 S. Ct. 126 (1997) (citations omitted). We have found no such cumulation of errors in this case.

## XIV. Denial of Discovery

Mr. Castro argues we should remand this case to the district court and order discovery of various things, including evidence of any contacts or relationships between Steven Gregory and the Kay and Noble County prosecutors and law enforcement personnel; any records of law enforcement personnel relating to Mr. Castro; Eastern State Hospital records relating to Mr. Castro and the doctors who evaluated him; and other matters. We review a district court's discovery rulings for an abuse of discretion. Sprague v. Thorn Americas, Inc., 129 F.3d 1355, 1368 (10th Cir. 1997). We find no abuse in this case.

## CONCLUSION

For the foregoing reasons we AFFIRM the dismissal of Mr. Castro's habeas petition.